UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| FIRST DAKOTA NATIONAL BANK,<br><br>Plaintiff,<br><br>vs.<br><br><br>OLD REPUBLIC NATIONAL TITLE<br>INSURANCE COMPANY,<br><br>Defendant. | 4:21-CV-04190-VLD<br><br><br>MEMORANDUM OPINION ON<br>CROSS-MOTIONS FOR SUMMARY<br>JUDGMENT |

**INTRODUCTION**

This matter is before the court on First Dakota National Bank's complaint alleging Old Republic National Title Insurance Company's bad faith denial of insurance coverage and seeking a declaratory judgment confirming coverage.  Docket No. 1, ¶¶ 42–52.  Pursuant to 28 U.S.C. § 1332, jurisdiction is premised on the parties' diversity of citizenship.  Id. ¶¶ 1–2, 41; Docket No. 12, ¶¶ 2, 27.  Pending are Old Republic's motion for summary judgment, Docket No. 36, and First Dakota's motion for partial summary judgment, Docket No. 41.

**FACTS**[1]

Arlo and Betty Clemensen owned and farmed approximately 1,440 acres of Spink County, South Dakota farmland (the "Property").  Docket No. 40, ¶ 1. Ron Clemensen is the son of Arlo and Betty.  Id. ¶ 2.  Arlo passed away in 2011, and Ron became the primary caregiver to Betty and began assisting with her financial affairs.  Id. ¶ 3.  Betty created a revocable trust called the Betty Clemensen Living Trust, dated July 29, 2014 ("Betty's Trust").  Id. ¶ 4.  Betty was the initial trustee of Betty's Trust.  Id. ¶ 5.  Betty transferred ownership of the Property into Betty's Trust.  Id. ¶ 6.

In July 2016, Ron submitted two applications to First Dakota National Bank, each for a loan in the principal amount of $750,000, for a total of $1,500,000 (the "Loans"), which First Dakota ultimately approved.  Id. ¶ 8. The proceeds from the Loans were paid to Dacotah Bank to pay down loans it previously made to Arlo, Betty, and Ron jointly as well as to Ron personally. Docket No. 45, ¶ 14.  The Loans were to be secured by two mortgages on the Property, one mortgage for each of the two loans (the "Mortgages").  Docket No. 40, ¶ 9.  Land owned by Ron's Living Trust was also mortgaged.  Docket No. 45, ¶ 2.  First Dakota ordered and received title commitments from Spink County Abstract & Title Insurance Inc.  Docket No. 40, ¶ 10.  Spink County Title is an agent of Old Republic for the purpose of issuing title commitments

---

[1] For readability, the court omits most quotation marks and citations to exhibits, the parties' statements of undisputed material facts, or responses to those statements.

and title insurance policies underwritten by Old Republic, pursuant to the terms of a written agency agreement.  Id. ¶ 11.

Upon its review of the title commitments, First Dakota came to learn that the Property was owned by Betty's Trust.  Id. ¶ 12.  A training manual created for First Dakota's closing specialists instructed that if a trust was a borrower, the "Full Trust Agreement (no exceptions)" needed to be obtained and reviewed in its entirety "to determine there is proper evidence of who signs and what powers are given."  Id. ¶ 13; Docket No. 37-3 at pp. 3–4; Docket No. 48-1, ¶ 13; Docket No. 48-2, ¶ 5.

The manual also instructed:  "Watch for any hidden options to purchase or caveats that affect the use of the collateral to be granted," and included "[s]pecific trust authorization to borrow money and pledge trust property as collateral" among the items "most important to pay attention to."  Docket No. 37-3 at p. 4; Docket No. 40, ¶ 14; Docket No. 48-1, ¶ 14.  It further emphasized, "Power of Attorney cannot sign for a trust or other entity."  Docket No. 37-3 at p. 4 (bold red text omitted); Docket No. 40, ¶ 15.

Prior to closing, First Dakota requested, received, and reviewed a copy of the trust agreement for Betty's Trust.  Docket No. 40, ¶ 16.  It also requested, received, and reviewed an unsigned certificate of trust for Betty's Trust that was to be signed by Betty at closing.  Id. ¶ 17.  The certificate of trust identified Betty as the sole "present Trustee" of Betty's Trust, expressly stated that the Trustee (Betty) was authorized to encumber and otherwise deal with interests

3

in real property in Betty's Trust's name, and provided a signature line for only Betty to sign as Trustor and Trustee.  Id. ¶ 18.

In an email between Shane Pick, Dakota MAC Closing Specialist, and Corey Maaland, Dakota MAC Loan Production Officer, Maaland was advised by Mr. Pick that "Betty Clemensen [would] have to be at the closing to sign the Mortgage and a Trust Certificate."  Docket No. 37-10 at pp. 2–3.  First Dakota had its closing specialist review the power of attorney and sent it to the secondary market (Agri-Access) for review and approval.  Docket No. 45, ¶ 17.

Betty was unable to attend the closing, so First Dakota gave Ron permission to use a power of attorney to sign the Mortgages on behalf of Betty's Trust.  Docket No. 40, ¶ 19; Docket No. 45, ¶ 3.  A few months before, Ron used the same power of attorney to sign three mortgages granted by Betty's Trust to Great Plains Bank as security for Ron's loans.  Docket No. 45, ¶ 18. Ron represented to First Dakota that he had authority to execute the Mortgages on behalf of Betty's Trust.  Id. ¶ 19.  First Dakota did not have much experience using a power of attorney in lending situations.  Id. ¶ 16.  First Dakota requested a copy of the power attorney, and it received and reviewed a document entitled "Property Power of Attorney of Betty Clemensen."  Docket No. 40, ¶ 20.  First Dakota did not send a copy of any power of attorney documents to Spink County Title either before or after the closing.  Id. ¶ 22. First Dakota prepared the Mortgages and other loan documents to be signed at closing.  Id. ¶ 23.

First Dakota conducted the closing at Ron's home in his kitchen on September 29, 2016. Docket No. 40, ¶ 25. It is not unusual for lenders to close their own transactions, nor do the Title Policies prohibit a lender from closing its own transaction. Docket No. 45, ¶¶ 34–35. First Dakota never met with Betty at any time. Docket No. 40, ¶ 27. Ron signed both mortgages "Ronald Clemensen Poa" on a line designated "Ronald Clemensen, Power of Attorney of the Betty Clemensen Living Trust dated July 29, 2014." Id. ¶ 28; Docket No. 37-7 at p. 13 (this signature block included a middle initial "P."); Docket No. 37-8 at p. 13. First Dakota employee Corey Maaland notarized Ron's signatures on the Mortgages and further certified in the acknowledgement on the Mortgages that Ron was "known to me to be an authorized trustee or agent of the trust that executed the Mortgage[s]." Docket No. 40, ¶ 29. First Dakota did not have Ron sign the certificate of trust for Betty's Trust. Id. ¶ 30. Betty signed the certificate of trust the following day. Id. ¶ 31. First Dakota hand-delivered the signed Mortgages to the Spink County Register of Deeds for recording on the same day of the closing. Id. ¶ 32. First Dakota did not provide the Mortgages to Spink County Title prior to closing or prior to recording. Id. ¶ 33. There was no requirement that it do so. Docket No. 45, ¶ 25.

After the closing, at the request of First Dakota, Spink County Title, as agent for Old Republic, issued a loan policy of title insurance for each of the two Mortgages (the "Title Policies"). Docket No. 40, ¶ 34. The Title Policies utilize the standard form ALTA Loan Policy of Title Insurance 6-17-06 and

contain identical Covered Risks, Exclusions from Coverage, Exceptions from Coverage, and Conditions.  Id. ¶ 35.  The Title Policies were effective September 29, 2016, the same date as the Mortgages.  Docket No. 45, ¶ 22.  When a customer closes its own transaction, Spink County Title reviews the closing documents — including the mortgage — to ensure the documents are satisfactory before issuing the final policy.  Id. ¶ 36.  Spink County Title — Old Republic's agent — reviewed the Mortgages prior to issuing the final Title Policies.  Id. ¶ 24.  Agri-Access, a non-party lender, participated in the Loans at 100% participation.  Docket No. 40, ¶ 36.

Brock Klapperich is Betty's grandson and Ron's nephew.  Id. ¶ 37.  Upon becoming aware of the Loans and Mortgages, after Ron defaulted, Klapperich, acting as Betty's temporary conservator and the successor trustee of Betty's Trust, filed a lawsuit against First Dakota in December 2017 in the Spink County Circuit Court (the "Klapperich Lawsuit").  Id. ¶ 38; Docket No. 45, ¶ 4.  The original complaint in the Klapperich Lawsuit asserted two counts against First Dakota: (1) declaratory judgment that the Mortgages were void because Ron did not have authority to bind Betty's Trust when he executed the Mortgages ostensibly on behalf of Betty's Trust; and (2) declaratory judgment that the Mortgages are void because Ron as attorney-in-fact did not have the power to self-deal and the Mortgages did not benefit Betty.  Docket No. 40, ¶ 39.

First Dakota tendered notice of the Klapperich Lawsuit to Old Republic, "report[ing] a potential claim on the [Title Policies]."  Id. ¶ 40; Docket No. 48-10.

Old Republic investigated the claims and issued a coverage determination letter dated January 12, 2018, in which Old Republic agreed to provide a defense to First Dakota against the declaratory judgment counts, subject to a reservation of rights to deny liability and terminate coverage if Old Republic discovered facts or other information that would indicate that there was no coverage for the loss.  Docket No. 40, ¶ 41.  Old Republic reserved the right to reevaluate coverage if First Dakota knew, participated, and/or contributed to Ron's alleged self-dealing and/or alleged lack of authority.  Id. ¶ 42.  It cited to Klapperich's allegation that First Dakota knew or should have known that Ron did not have the authority to self-deal.  Id.  Old Republic's reservation was based on First Dakota's knowledge, conduct, and effect flowing from the fact that First Dakota "structured the loans to the security instruments," conducted its own closing, and disbursed the loan proceeds.  Id.  Old Republic also "[c]ited to Exclusion 3 in the Title Policies, which provides that Old Republic will not pay loss or damage, costs, attorneys' fees, or responses[2] that arise by reason of defects, liens, encumbrances, adverse claims, or other matters created, suffered, assumed, or agreed to by [First Dakota]."  Id.

Old Republic retained attorney Reed Rasmussen of the Siegel, Barnett & Schutz law firm to represent and defend First Dakota against the declaratory judgment counts.  Id. ¶ 43.

---

[2] The exclusion states "expenses," not "responses."  See Docket No. 37-15 at p. 4.  First Dakota did not dispute the term "responses," so it controls for purposes of adjudicating Old Republic's motion.  Wallace v. FIMCO Inc., 4:23-CV-04045-VLD, 2024 WL 3624770, at *1 n.3 (D.S.D. Aug. 1, 2024) (citing D.S.D. L.R. 56.1(D)).

Shortly after the Klapperich Lawsuit was filed, Agri-Access requested that First Dakota buy back the Loans.  Id. ¶ 44.  First Dakota bought back 50% of the Loans.  Id. ¶ 48.

First Dakota submitted a claim with its errors and omissions insurer after the Klapperich Lawsuit was filed, but the claim was rejected as untimely. Id. ¶ 49.

On or about October 3, 2018, Klapperich filed an amended complaint in the Klapperich Lawsuit which added new counts against First Dakota, including conspiracy to exert undue influence, conspiracy to commit conversion, civil conspiracy, unjust enrichment, and a RICO claim.  Id. ¶ 50. Old Republic reviewed the amended complaint and, in a letter to First Dakota dated October 24, 2018, confirmed that it would continue to provide a defense to First Dakota as to the declaratory judgment counts subject to the reservations outlined in the January 12, 2018, letter.  Id. ¶ 51.  Old Republic further informed First Dakota that it would not provide a defense as to Klapperich's newly added counts against First Dakota because they were tort claims that, if proven true, would not result in a loss under any of the Covered Risks listed in the Title Policies.  Id. ¶ 52.

During settlement discussions in the Klapperich Lawsuit, Old Republic offered an amount, disputed among the parties as either $200,000 or $375,000.  Id. ¶ 53; Docket No. 38, ¶ 5; Docket No. 48-1, ¶ 53; Docket No. 48-2, ¶ 3.  Old Republic was willing to contribute more, but the mediation ended

before it had the opportunity to increase its offered contribution.  Docket No. 40, ¶ 53.

After several years of litigation, Klapperich filed a motion for partial summary judgment as to the declaratory judgment counts against First Dakota.  Id. ¶ 54.  That motion culminated in a memorandum decision in Klapperich's favor dated March 5, 2021, in which the court ruled the Mortgages were void.  Id.  The court found that "[s]ince Betty appointed herself as trustee of [Betty's Trust], she alone, acting as trustee, had the power to encumber the Trust estate with mortgages."  Docket No. 37-1 at p. 7.  The court stated that a section of Betty's Trust "allows for an attorney-in-fact to act on Betty's behalf as *trustor*.  It does not confer the powers of a trustee onto an attorney-in-fact, nor could it."  Id. at p. 8.  Turning its attention to the power of attorney, the court held it did "not specifically allow Ron to mortgage [the Property] for his own benefit."  Id. at p. 9.

Shortly after that memorandum decision, Old Republic sent a letter to First Dakota dated March 22, 2021, that reaffirmed the reservation of rights in light of the factual findings and conclusions made by the Spink County Circuit Court, reaffirmed that Old Republic was not defending First Dakota against the "tort claims," and confirmed that Old Republic authorized Attorney Rasmussen to pursue an appeal at Old Republic's expense.  Docket No. 40, ¶ 56.

Following the memorandum decision, Klapperich filed a third amended complaint that asserted slander of title, breach of the implied covenant of good faith and fair dealing, aiding and abetting breach of fiduciary duty, conversion,

exploitation of the elderly, and unjust enrichment.  Id. ¶ 57.  Old Republic

reviewed the third amended complaint and, in a letter to First Dakota dated

April 6, 2021, confirmed that it was not defending First Dakota against the tort

claims[3] because the Title Policies do not provide coverage against such claims.

Id. ¶ 58.  It also restated that it had authorized Attorney Rasmussen to pursue

an appeal of the court's memorandum decision at Old Republic's expense and

reiterated its reservation of rights to deny indemnification pursuant to the

terms of the Title Policies.  Id.

    First Dakota retained its own counsel to defend against the "tort claims."

Id. ¶ 59.  First Dakota elected to settle the tort claims with Mr. Klapperich.  Id.

¶ 60. Old Republic decided not to pursue an appeal of the declaratory

judgment counts, but the parties dispute the reason for that decision.  Id.;

Docket No. 48-1, ¶ 60.

    First Dakota filed its complaint with this court on November 12, 2021.

Docket No. 1.  It seeks a "judicial determination . . . that the actions alleged by

---

[3] Slander of title, conversion, exploitation of the elderly, and breach of fiduciary duty are torts.  RESTATEMENT (SECOND) OF TORTS § 624 (AM. LAW INST. 1977); Mach v. Connors, 979 N.W.2d 161, 172 (S.D. 2022); cf. In re Certification of a Question of Law, 981 N.W.2d 325, 331–35 (S.D. 2022); In re Elizabeth A. Briggs Tr., 898 N.W.2d 465, 471 (S.D. 2017).  "South Dakota does not recognize an independent tort for breach of the implied covenant of good faith and fair dealing."  Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 193 (S.D. 2007) (cleaned up).  That cause of action sounds in contract.  Id. at 193–94 (citations omitted).  Unjust enrichment is not a tort, it is an equitable doctrine.  Mack v. Mack, 613 N.W.2d 64, 69 (S.D. 2000); see RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 1 (2011).  The letter from Old Republic listed all these claims in bullet point fashion and stated:  "If the allegations are taken as true as to the *above-listed tort claims* in the Third Amended Complaint, there would be no loss falling under any of the Covered Risks of the policy."  Docket No. 37-22 at p. 2 (emphasis added).

Klapperich in the [t]hird [a]mended [c]omplaint . . . are Covered Risks and not

Exclusions from Coverage as set forth in the [Title Policies]." Id. ¶ 43. It

further "seeks a judicial determination that Old Republic should provide

and/or pay it $1,500,000.00 and all other covered costs and expenses

associated with the Klapperich [Lawsuit]," as well as attorney's fees. Id. ¶¶ 44-

45. First Dakota also brings a count of bad faith denial of insurance coverage.

Id. ¶¶ 46–52.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a). It is, therefore, the moving

party's burden "to establish both the absence of any genuine issue of material

fact and that the moving party is entitled to judgment as a matter of law." S.

Black Hills Water Sys., Inc. v. Town of Hermosa, 5:21-CV-05070-VLD, 2023 WL

4824956, at *4 (D.S.D. July 27, 2023). "Once the movant has met its burden,

the nonmoving party may not simply rest on the allegations in the pleadings,

but must present facts, by affidavit or other evidence, showing that a genuine

issue of material fact exists." Id. (citing Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)). That evidence must be sufficiently

probative to "permit a finding in [the non-moving party's] favor on more than

mere speculation, conjecture, or fantasy." Musolf v. J.C. Penney Co. Inc., 773

F.3d 916, 918 (8th Cir. 2014) (citation omitted). The court will "review the

evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party." Id. (citation omitted). "[C]ross-motions [for summary judgment] require the court to evaluate each motion independently." Black Hills, 2023 WL 4824956, at *5 (citations omitted).

Pursuant to the choice of law provision in the Title Policies, South Dakota law governs this matter. See Docket No. 1-6 at p. 11; Docket No. 1-7 at p. 11.

**B.    Old Republic's Motion for Summary Judgment**

    **1.    Declaratory Judgment as to Coverage**

        **a.    Whether Old Republic has a Duty to Indemnify the Loss from the Klapperich Lawsuit's Declaratory Judgment Counts**

First Dakota "seeks a judicial determination . . . pursuant to the [Title Policies] that the actions alleged by Klapperich in the Third Amended Complaint against [First Dakota] are Covered Risks and not Exclusions From Coverage." Docket No. 1, ¶ 43. Old Republic seeks summary judgment on this claim.

The court first analyzes Klapperich's declaratory judgment counts, which ultimately led to a conclusion that the Mortgages were void.

Under the Covered Risks listed in the Title Policies are the following:

2    Any defect in or lien or encumbrance on the Title.  This Covered Risk includes but is not limited to insurance against loss from
        (a)    A defect in the Title caused by . . .
            (v)    a document executed under a falsified, expired, or otherwise invalid power of attorney[.]

12

> 9    The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title.  This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage . . .
>> (c)    the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered . . .
>> (e)    a document executed under a falsified, expired, or otherwise invalid power of attorney[.]

Docket No. 42-6 at pp. 1–2; Docket No. 42-7 at pp. 1–2.

The Spink County Circuit Court held that only Betty Clemensen, as trustee, had the power to encumber the Property with mortgages and that Betty's Trust did "not confer the powers of a trustee onto an attorney-in-fact, nor could it."  Docket No. 37-1 at pp. 7–8.  It further held that "the Power of Attorney itself does not specifically allow Ron to mortgage [Betty's Trust]'s estate for his own benefit."  Id. at p. 9.  The court held the Mortgages were void, "invalid or unlawful from [their] inception."  Id. at p. 10 (quoting Hanna v. Landsman, 945 N.W.2d 534, 545 (S.D. 2020)).

Old Republic denies the duty to indemnify First Dakota's loss on two theories:  Exclusion 3(a) and Exclusion 3(b) of the Title Policies.  Docket No. 39 at pp. 16–22.

### i.    Exclusion 3(a)

Exclusion 3(a) states:

> The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of
> 3    Defects, liens, encumbrances, adverse claims, or other matters [hereinafter "defect"]
>> (a)    created, suffered, assumed, or agreed to by the Insured Claimant[.]

13

Docket No. 42-6 at p. 2; Docket No. 42-7 at p. 2.

Old Republic argues that First Dakota "created, suffered, assumed, and agreed" to the defect in the Mortgages because it ignored language in its training manual cautioning that a power of attorney cannot sign for a trust. Docket No. 39 at pp. 17–19.  Old Republic also cites to manual text advising a review of the trust document "in its entirety" to determine what powers it conveys "to borrow money and pledge trust property as collateral," and to whom.  Id. at p. 17.  Old Republic points out that Shane Pick, Dakota MAC Closing Specialist told Corey Maaland, Dakota MAC Loan Production Officer in an email that "Betty Clemensen will have to be at the closing to sign the Mortgage and a Trust Certificate."  Id. at p. 18; see Docket No. 37-10 at p. 3.

First Dakota counters that its employees' ignorance rises only to the level of negligence, but that to "create, suffer, assume, or agree" to a defect requires intent.  Docket No. 48 at pp. 2–9.

Under South Dakota law, "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application lawfully made a part of the policy."  SDCL § 58-11-39.  "To determine the scope of coverage in an insurance policy, [the court] confine[s] [itself] to the plain and ordinary meaning of the language of the policy and may not make a forced construction or a new contract for the parties."  Larimer v. Am. Family Mut. Ins. Co., 926 N.W.2d 472, 475 (S.D. 2019) (quotation omitted).  "When an insurer seeks to invoke a policy exclusion as a means of

14

avoiding coverage, the insurer has the burden of proving that the exclusion applies." Id. (quotation omitted).

Whether insurance contract language is ambiguous is a question of law. Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co., 822 N.W.2d 724, 726 (S.D. 2012) (citations omitted). If there is "genuine uncertainty as to which of two or more meanings is correct, the policy is ambiguous." Cornelius v. Nat'l Cas. Co., 813 N.W.2d 167, 169 (S.D. 2012) (quotation omitted). "Where the contract is ambiguous, 'the interpretation most favorable to the insured should be adopted.' " Larimer, 926 N.W.2d at 475–76 (quoting Ass Kickin Ranch, 822 N.W.2d at 727).

The South Dakota Supreme Court has yet to interpret Exclusion 3(a). This court must predict how that court would interpret the provision. Hot Stuff Foods, LLC v. Hous. Cas. Co., 771 F.3d 1071, 1075 (8th Cir. 2014). Old Republic claims, "there is no serious debate over [the] meaning[ ]" of the words "created," "suffered," "assumed," and "agreed to." Docket No. 39 at pp. 16–17. The court disagrees.

Old Republic argues First Dakota " 'created' the defect in the Mortgages when it drafted the Mortgages for Ron's signature, gave him permission to use a power of attorney to sign, and then recorded the Mortgages." Id. at p. 19. It also states First Dakota " 'agreed' to the defect . . . when it notarized Ron's signatures . . . and then recorded the Mortgages." Id. The court could construe these arguments as First Dakota created, or agreed to, the defect by creating the Mortgages. See Docket No. 54 at p. 3 ("[T]here is no dispute that

15

[First Dakota] itself drafted the Mortgages, had Ron sign on behalf of Betty's Trust, conducted the closing, and recorded the Mortgages.  These acts are the very definition of bringing the defective Mortgages into being, causing the defective Mortgages to exist, and producing the Defective Mortgages.").  But if Old Republic's insured bear the risk of a defect or adverse claim simply by creating mortgages, then the coverage would be illusory.  There must be some plus factor to rise to the level of "created," "suffered," "assumed," or "agreed to" a *defect*.

The court could construe that plus factor in terms of constructive knowledge, i.e., First Dakota created the defect because it should have known Ron Clemensen was an improper signatory for Betty's Trust.  See Nelson v. Nelson Cattle Co., 513 N.W.2d 900, 905 (S.D. 1994) ("A person has constructive knowledge of a risk if it is plainly observable so that anyone of competent faculties is charged with knowledge of it.") (citation omitted).  A similar interpretation might sound in negligence.  See, e.g., Docket No. 48 at p. 5 ("First Dakota's failure to follow its internal training policies concerning review of documents and use of a power of attorney can establish, at best, negligence.").  While the court agrees such interpretations are reasonable, the exclusion contains verbs better understood as active undertakings, not passive consequences.  See Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp., 793 F.2d 780, 784 & n.1 (6th Cir. 1986) (quoting, *inter alia*, Brown v. St. Paul Title Ins. Co., 634 F.2d 1103, 1107–08 n.8 (8th Cir. 1980)).  The Sixth Circuit explains:

> The term "created" has generally been construed to require a
> conscious, deliberate and sometimes affirmative act intended to

16

bring about the conflicting claim, in contrast to mere inadvertence
or negligence.  Similarly, the term "suffered" has been interpreted
to mean consent with the intent that "what is done is to be done,"
and has been deemed synonymous with "permit," which implies
the power to prohibit or prevent the claim from arising.  Further,
an insured does not assume an assessment against property
"merely because he agreed to take the property 'subject to' any
assessments."  "Assume," under this definition requires knowledge
of the specific title defect assumed.  And "agreed to" carries
connotations of "contracted," requiring full knowledge by the
insured of the extent and amount of the claim against the
insured's title.  As with the other terms, this definition implies
some degree of intent.

Id. (citations omitted).

Reasonable and most favorable to the insured would be to construe the

plus factor in terms of such fulfilled intent.  The intentional conduct "need not

constitute misconduct."  See Transamerica Title Ins. Co. v. Alaska Fed. Sav &

Loan Ass'n, 833 F.2d 775, 776 (9th Cir. 1987).  Reading a requirement of

misconduct into the provision would artificially narrow it.  But the court

recognizes that in most instances, an intent to create a defect will be attended

by some degree of mischief.

This interpretation complements Exclusion 3(b), which excludes defects

actually known to the insured but not in the public record.  See, e.g., Docket

No. 42-6 at p. 2.  Implicit in that exclusion is the recognition that the issuance

of title insurance follows an abstraction—"allowing the insurer to reduce or

eliminate risk by conducting a careful title search to identify defects."  Cf.

Captiva Lake Invs., LLC v. Fid. Nat'l Title Ins. Co., 883 F.3d 1038, 1043 (8th

Cir. 2018) (quotation omitted).  And so, the contract places the onus for failing

to uncover a public defect on the insurer—*except* (and this is where Exclusion

17

3(a) comes in)—when the insured is the architect of that defect.  The remaining, unknown risk gets priced into the premium.  See Gregory v. Clausen, 99 N.W.2d 883, 885 (S.D. 1959) ("Contracts of insurance . . . indemnify against loss, damage, or liability arising from an unknown or contingent event.") (quotation omitted).

These conclusions fit neatly with the Eighth Circuit's construction of Exclusion 3(a), which the court adopts:  the exclusion applies "where the defects . . . [are] caused by deliberate, dishonest, illegal, or inequitable dealings by the insured."  Chi. Title Ins. Co. v. Resolution Tr. Corp., 53 F.3d 899, 907 (8th Cir. 1995) (quotation omitted).

Applying that construction to the facts, the court concludes there remains a genuine dispute of material fact as to whether the defective Mortgages were the product of First Dakota's "deliberate, dishonest, illegal, or inequitable" acts.  Old Republic refers the court to an email where Dakota MAC employee Shane Pick stated, "Betty Clemensen will have to be at the closing to sign the Mortgage and a Trust Certificate."  Docket No. 40, ¶ 24; Docket No. 37-10 at p. 3.  Yet at Pick's deposition, he testified to an understanding that the power of attorney negated the need for Betty's presence.  Docket No. 37-2 at pp. 9-10 (Pick Depo. at pp. 35-39).  It is not for this court on a motion for summary judgment to weigh such evidence or make credibility determinations.  Kenney v. Swift Transp., Inc., 347 F.3d 1041, 1044 (8th Cir. 2003) (citation omitted).

Old Republic argues the Spink County Circuit Court's "dispositive finding that [First Dakota] took a calculated risk and bore that risk" controls the outcome.  Docket No. 54 at p. 10.  Presumably its argument arises under the doctrine of collateral estoppel.  See id. at pp. 8–9.  The argument is misplaced.

Collateral estoppel bars the "relitigation of an essential fact or issue involved in an earlier suit." Estes v. Millea, 464 N.W.2d 616, 618 (S.D. 1990). In other words, the issue must have been "essential to the judgment" in the prior suit.  In re Mehrer, 273 N.W.2d 194, 198 (S.D. 1979) (quotation omitted). The circuit judge's discussion of risk invoked by Old Republic related to First Dakota's claim of unjust enrichment brought against Betty's Trust.  See Docket No. 37-1 at pp. 10–14.  In resolving that claim, the circuit judge found that First Dakota did not confer a benefit on to Betty's Trust.  Id. at p. 10.  That finding alone was fatal to the unjust enrichment claim.  See Mack v. Mack, 613 N.W.2d 64, 69 (S.D. 2000).  All that came thereafter, including the discussion of risk, was merely dicta.  It retains no power for purposes of collateral estoppel.  Even if it did, the circuit judge found First Dakota "bore the risk of loss" by examining the text of various documents—the certificate of trust, the power of attorney.  See Docket No. 37-1 at p. 13.  This court held above that Exclusion 3(a) requires more than constructive knowledge—it requires proof of fulfilled intent.  For that purpose, the circuit judge's opinion does not bar litigation of whether Exclusion 3(a) bars coverage for First Dakota's claim.

The court denies summary judgment as to Exclusion 3(a).

## ii.    Exclusion 3(b)

Exclusion 3(b) states:

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of

3    Defects, liens, encumbrances, adverse claims, or other matters [hereinafter "defect"] . . .

(b)    not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy[.]

Docket No. 42-6 at p. 2; Docket No. 42-7 at p. 2.

"Knowledge" or "Known" is defined as "[a]ctual knowledge, not constructive knowledge or notice that may be imputed to an insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title."  Docket No. 42-6 at p. 3; Docket No. 42-7 at p. 3.

The South Dakota Supreme Court has yet to interpret Exclusion 3(b).

Old Republic points to a First Dakota training manual's language that a "Power of Attorney cannot sign for a trust" as sufficient to establish actual knowledge.  Docket No. 39 at p. 20.  The court disagrees.  Old Republic supplies no facts showing any employee involved in creating the Mortgages was aware of the manual.  Absent such facts, Old Republic is merely imputing knowledge to First Dakota "by reason of . . . other records," an act expressly proscribed by the policy's definition of "Known."  Docket No. 42-6 at p. 3; Docket No. 42-7 at p. 3.

20

Old Republic repeats the mistake by imputing knowledge to First Dakota from the language of the Trust Agreement, the Certificate of Trust, and the Power of Attorney.  Docket No. 39 at pp. 20–21.

By providing no facts establishing First Dakota's actual knowledge of the defects, Old Republic fails to meet its burden of establishing that there is no genuine dispute as to material fact on the issue.  The court denies summary judgment as to Exclusion 3(b).

> **b.    Whether Old Republic Had a Duty to Defend the Additional Claims in the Third Amended Complaint**

In First Dakota's complaint, it seeks declaratory judgment "that the actions alleged by Klapperich in the Third Amended Complaint against [First Dakota] are Covered Risks."  Docket No. 1, ¶ 43.  It also seeks declaratory judgment that Old Republic should pay "all . . . covered costs and expenses associated with the Klapperich [Lawsuit]."  Id. ¶ 44.

Old Republic interprets those claims as meaning it is on the hook for the cost of defending all of Klapperich's counts—from all iterations of the Klapperich complaint—not just the declaratory judgment counts it did defend. Cf. Docket No. 39 at pp. 8–16.  As such, it briefed not only why the additional counts are not Covered Risks, but why the "in for one, in for all" or "complete defense" rule, adopted by South Dakota, is inapplicable in the title insurance context.[4]  Id.

---

[4] This rule states "[i]f just one claim falls within the policy coverage, the insurer must defend even though the pleadings are ambiguous or reveal other claims not covered in the policy, and notwithstanding that extraneous facts indicate

The court need not wade into the "complete defense" argument, a matter of first impression in South Dakota, because First Dakota's response brief argues only one narrow issue:  whether slander of title must be defended because it is arguably a Covered Risk.  Docket No. 48 at pp. 21–23.  The remaining arguments are waived.  Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009).

Condition 5 of the Title Policies state:

> [Old Republic] shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured[.]  This obligation is limited to only those stated causes of action alleging matters insured against by this policy[.]

Docket No. 42-6 at p. 4; Docket No. 42-7 at p. 4.

Slander of title is a tort.  RESTATEMENT (SECOND) OF TORTS § 624 (AM. LAW INST. 1977).  Old Republic argues it has no duty to defend First Dakota against tort claims because "they are not attacks on title."  Docket No. 39 at p. 9. Old Republic reasons that if the tort claims were "proven true, [they] would not result in a loss under any of the Covered Risks listed in the Title Policies."  Id.

First Dakota argues the slander of title claim arises from the same fact pattern as the counts defended by Old Republic:

> that First Dakota knew or should have known that Clemensen did not have the authority under the power of attorney to bind Betty's Trust to the mortgages, and therefore, First Dakota's filing of those mortgages . . . "cast doubt upon the existence or extent of Betty's Trust's property . . . which induced others not to deal with Betty's Trust with respect to [the Property]."

---

the claim is false, groundless or even fraudulent."  Biegler v. Am. Fam. Mut. Ins. Co., 621 N.W.2d 592, 599 (S.D. 2001) (quotation omitted).

Docket No. 48 at p. 22 (quoting Docket No. 37-21, ¶ 164).

First Dakota argues that this factual basis "is an attack on the validity of the mortgages . . . the very risk that Old Republic agreed to insure." Id. at p. 23.

Old Republic has the better argument. In South Dakota, "if it is clear or arguably appears from the face of the pleadings . . . that the alleged claim, if true, falls within policy coverage, the insurer must defend." Hawkeye-Security Ins. Co. v. Clifford, 366 N.W.2d 489, 491 (S.D. 1985). As Old Republic points out, if Klapperich's slander of title claim proved true, his remedy would be money damages. See Fix v. First State Bank, 807 N.W.2d 612, 617 (S.D. 2011) (quoting SDCL § 21-3-1). But the Covered Risk First Dakota invokes here is "loss or damage . . . by reason of . . . [t]he invalidity or unenforceability of the lien of the Insured Mortgage upon the Title." Docket No. 48 at p. 22; see Docket No. 42-6 at pp. 1–2; Docket No. 42-7 at pp. 1–2. Klapperich's slander of title claim could never invalidate a lien nor render one unenforceable. For that reason, the claim, if proven true, would not provide coverage. And with no potential for coverage, there is no duty to defend. Hawkeye-Security Ins. Co., 366 N.W.2d at 491.

Old Republic's motion for summary judgment is granted as to the question of its duty to defend.

## 2.    Bad Faith Denial of Insurance Coverage

First Dakota alleges first-party and third-party bad faith refusal to pay insurance benefits against Old Republic. Docket No. 1, ¶¶ 46–52.

### a.    First-Party Bad Faith

First Dakota asserts first-party bad faith against Old Republic for "consciously engag[ing] in wrongdoing in processing or evaluating [First Dakota]'s claims under its [Title Policies]." Id. ¶ 47.  First Dakota accuses Old Republic of denying coverage without having "any reasonable basis." Id. ¶ 49.  First Dakota accuses Old Republic of invoking "wholly inapplicable" exclusions to deny reimbursement, while "refusing adequate authority" to successfully settle.  Id. ¶ 52.

"[F]irst-party bad faith is an intentional tort that typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured." Harvieux v. Progressive N. Ins. Co., 915 N.W.2d 697, 701 (S.D. 2018) (quotation omitted).  To be successful, a first-party bad faith claimant must prove "(1) an absence of a reasonable basis for denial of policy benefits, and (2) the insurer's knowledge of the lack of a reasonable basis for denial." Mordhorst v. Dakota Truck Underwriters, 886 N.W.2d 322, 324 (S.D. 2016) (cleaned up and quotation omitted).  "Knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless indifference to facts or to proofs submitted by the insured." Id. (alteration and quotation omitted).  But "an insurer is permitted to challenge claims that are fairly debatable." Harvieux, 915 N.W.2d at 701.

Old Republic's "primary argument for dismissal of [this] claim" is that "if [First Dakota] is not entitled to indemnification under the Title Policies, then by

definition there cannot be bad faith by Old Republic."  Docket No. 54 at p. 12.
"And since both Exclusion 3(a) or [sic] 3(b) preclude [First Dakota] from
indemnification," it argues, "then the entire basis on which [First Dakota's] bad
faith claim is predicated is eliminated."  Id.

But this court does not agree with Old Republic that the question of
indemnification is a foregone conclusion.  See Section B1, supra.  Without that
predicate finding, the argument fails.

Similarly, Old Republic's assertion that its reservation of rights "was
proper because the allegations, if proven true, would implicate Exclusions 3(a)
and 3(b)," Docket No. 39 at p. 23, relies on an interpretation of those
exclusions that conflicts with the court's.  Klapperich's Count Two states "[a]t
all times relevant herein, [First Dakota] knew *or should have known* that
Clemensen did not have the authority to self-deal.  Because the mortgages
described herein constituted acts of self-dealing . . . Clemensen had no power
or authority to execute the same."  Docket No. 37-21, ¶¶ 123–24 (emphasis
added).  This court does not adopt an interpretation of Exclusion 3(a) that
embraces constructive knowledge, and Exclusion 3(b) requires actual
knowledge.  So, application of the exclusions and proof of Klapperich's
allegations are not co-extensive.  As First Dakota points out, the "key issue" of
whether First Dakota had actual knowledge of a defect remains.  Docket No. 48
at p. 12.

###### b.    Third-Party Bad Faith

First Dakota asserts third-party bad faith against Old Republic for "[r]epeatedly refusing adequate authority to settle the Klapperich claims" and "[r]epeatedly refusing adequate authority to successfully mediate the Klapperich claims."  Docket No. 1, ¶ 52(b)–(c).

"Third-party bad faith is based on principles of negligence and arises when an insurer wrongfully refuses to settle a case brought against its insured by a third-party."  Johnson v. UPS, 946 N.W.2d 1, 9 (S.D. 2020) (quotation omitted).

Old Republic argues that the contract provides it the option, not a mandate, to settle third-party claims, and so third-party bad faith cannot apply.  Docket No. 39 at p. 24.  First Dakota argues that once Old Republic opened the door to the possibility of settlement, it was required to "operate in good faith."  Docket No. 48 at p. 18.

First Dakota's argument aligns with South Dakota law, which already recognizes the option of the insurer to settle.  It holds third-party bad faith arises when "an insurer breaches its duty to give equal consideration to the interests of its insured *when making a decision to settle a case* brought against its insured by a third party."  Zochert v. Protective Life Ins. Co., 921 N.W.2d 479, 489 (S.D. 2018) (emphasis added) (quotation omitted).  The existence of the option does not vitiate the duty—it animates it.

Old Republic argues it "offered $375,000 toward a settlement and was willing to contribute more, but the mediation ended before Old Republic had

the opportunity to increase its offered contribution." Docket No. 39 at p. 24.
First Dakota puts that figure into dispute, see Docket No. 48 at p. 18; Docket
No. 48-12 at p. 20 (Weishaar Depo. at pp. 129-31); Docket No. 48-14, and
supplies evidence that it was unable to settle due to lack of awareness of Old
Republic's authority to settle for $600,000. Docket No. 48 at p. 18; Docket No.
48-12 at p. 20 (Weishaar Depo. at pp. 129-31); Docket No. 48-31 at p. 1; see
Kirchoff v. Am. Cas. Co., 997 F.2d 401, 405 (8th Cir. 1993) (applying South
Dakota law) ("Clearly, if Janice Millford valued Kirchoff's claim at $300,000 . . .
but offered only $8000 to settle Kirchoff's claim, evidence of that valuation was
relevant to the issue of whether CNA's settlement offers were made in good
faith.").

"The question of whether an insurer has acted in bad faith is generally a
question of fact." Dakota, Minn. & E. R. Corp. v. Acuity, 771 N.W.2d 623, 629–
30 (S.D. 2009) (citation omitted). Old Republic fails to establish there is no
genuine issue of material fact remaining. The motion for summary judgment
on Count Two is denied.

## C.    First Dakota's Motion for Partial Summary Judgment

First Dakota "seeks a judicial determination that the [Title Policies]
provide coverage for losses sustained by First Dakota as a result of a state
court ruling invalidating the mortgages insured by the policies." Docket No. 44
at p. 1. In furtherance of that goal, it argues there is no question of material
fact remaining as to the applicability of Exclusions 3(a) or 3(b).

### 1.    Exclusion 3(a)

Relying on the interpretation of Exclusion 3(a) the court ultimately adopted, see Section B(1)(a)(i), supra, First Dakota argues it "quite obviously did not intentionally cause a defect in the Mortgages given that the real estate owned by Betty's Trust constituted First Dakota's primary collateral for Ron's loan."  Docket No. 44 at p. 9.

But as the court held above, it is not obvious.  As Old Republic points out, "[Shane] Pick . . . testified that he knew Betty would need to be at closing to sign the Certificate of Trust and the Mortgages, and he communicated this fact to the [First Dakota] loan officer who attended the closing."  Docket No. 49 at p. 8.  The fact that he later testified at deposition that he believed the power of attorney negated the need for Betty's presence is not dispositive—it creates a question of fact and credibility reserved for the factfinder.

First Dakota appeals to its loss of "millions of dollars when Ron defaulted."  Docket No. 44 at p. 9.  But Exclusion 3(a) recognizes the potential for loss; it exists to insulate Old Republic from that loss.  Contrary to First Dakota's briefing, there is no requirement that the creator "benefit" from its creation.  See id.

First Dakota's argument about what Spink County Title thought or did not think about the power of attorney also has no application here.  See id. at pp. 9–10. Exclusion 3(a) excludes coverage for defects "created, suffered, assumed, or agreed to by the Insured Claimant."  Docket No. 42-6 at p. 2.  There is no saving clause permitting assignment of blame to an accomplice; the

thrust of Exclusion 3(a) is the insured's intent.  Even if First Dakota and Spink County Title agreed to the defect, the exclusion would be triggered absent an endorsement suggesting otherwise.

First Dakota's intent or lack thereof as it pertained to the title defects remains an open question of material fact.  The motion for summary judgment as to Exclusion 3(a) is denied.

### 2.    Exclusion 3(b)

First Dakota argues that Exclusion 3(b) does not apply because "[t]here is not a scintilla of evidence that First Dakota knew that the power of attorney did not authorize Ron to sign the Mortgages."  Docket No. 44 at p. 13.  But as the court explained above, Shane Pick's email *is* evidence of actual knowledge. Whether that evidence is outweighed by other evidence remains a question for the factfinder.  The motion for summary judgment as to Exclusion 3(b) is denied.

***

### CONCLUSION

Based on the foregoing facts, law, and analysis, it is hereby

ORDERED that Old Republic's motion for summary judgment (Docket No. 36) is granted as to its duty to defend and denied on all remaining matters.

ORDERED that First Dakota's motion for partial summary judgment (Docket No. 41) is denied.

DATED this 18th day of November, 2024.

BY THE COURT:

VERONICA L. DUFFY

United States Magistrate Judge